Case number 17-158NL. Celco Partnership v. DBA Verizon Wireless Petitioner v. National Labor Relations Court. Mr. Tellegen for the Petitioner, Ms. Sheehy for the Respondent. May it please the Court, my name is Arthur Tellegen. I represent the Petitioner-Celco Partnership, which you would likely know as Verizon Wireless. Most of the facts in this case are undisputed. The Communications Workers of America was certified as the bargaining agent of Verizon Wireless's employees in its Brooklyn, New York store in the spring of 2014. During the succeeding year, there on the record was zero evidence of any anti-anonymous displayed by Verizon Wireless toward the union, any unfair labor practices. So far as the record shows, the relationship between the CWA and Verizon Wireless was cordial and productive. Similarly, with respect to the alleged wrongfully discharged employee, Bianca Cunningham, the record is the opposite of any anonymous being shown to Ms. Cunningham. The undisputed testimony was when she was a member of the bargaining committee for the CWA. It was a productive relationship. The chief bargainer of the company said she was a professional. What was the third point? Well, there were actually four, Your Honor. The fourth point was disparate treatment. Oh, yes. And it was the handbook that he found in another case. Yes, the handbook. Then the disparate treatment is the fourth one. That's correct, Your Honor. Would you like me to address those? Yes, I think it's important. The handbook, nobody except the ALJ relied upon. But it came up in a different case. It came up in a different case. It displays nothing except the ALJ's desire to find anonymous. As to the Al Graves hit list, that was a piece of a racist rant against his manager, his African-American manager. Broom. Broom, exactly. It's a credit for anything. It's just inappropriate. Your point in the brief is there's no finding that there was, in fact, a hit list. Oh, there was no hit list. Even Mr. Graves, when he testified, said it was a figure of speech. It was not a – he denied it was ever a hit list. It was a figure of speech in the list of things. She could conclude, or the ALJ could conclude, that Graves was not telling the truth. But there is no finding, specific finding, that there ever was a hit list. No, there was not, Your Honor. There was no – other than the statement, there was nothing about a hit list in the record. As to the – I'm sorry, lost it. The time it took? The time it took. Thank you, Your Honor. The time it took. The time it took was the feature function of the NLRB's own rules requiring a process to be put in place with the – when you're terminating an employee. The Ritchie case. Exactly. In addition, the fact that the company, as was testified to without contradiction, not cited by the ALJ, was another employee who subsequently was subject to termination, and the parties decided to have the two people bring together the same Ritchie discussion. It just wasn't proof of anything except the fact that Verizon Wireless followed the rules. That left only a disparate treatment finding. Now, hold for one second. When you said another employee, totally unrelated to this event? Yes. I see. As to the disparate treatment, the board went through hundreds of files of employees. They found in some cases that you could characterize some of the employees as being dishonest during an investigation. You could characterize that way. And there were certainly cases where the company terminated people. Why? During the discussion, during the investigation. There's simply no patent, as you find in other cases. There was one case, as I recall, that a manager was credited an assistant manager, even though she had misstated whether her e-mails existed, and the manager believed her that she had forgotten. That's correct. So the ALJ concluded, I guess, that he wouldn't have credited the assistant manager, which is sort of strange. Exactly correct, Your Honor. To find disparate treatment here, you have to accept the ALJ's process of recharacterizing some cases, ignoring the evidence where consistent treatment was given, and inferring from that, and frankly only from that, that there was anti-union animus. This stands in the face of the undisputed testimony, never cited by the ALJ, that everybody from the company who dealt with Ms. Cunningham respected her, believed her. In fact, the basic facts of the case are that it was because the company believed her, trusted her, that they terminated the other employee, Ms. Escheritore. You were going to terminate her, you didn't terminate her. Exactly right, Your Honor. We were going to terminate her. We did not. It was only when Ms. Cunningham finally gave the evidence that proved that she was not telling the truth, and Ms. Escheritore was, that it got to her. What did you think of the Chairman's statement in the footnote that he didn't think Cunningham had lied? I don't know what to make of that comment. The Chairman certainly knew that it wasn't even a relevant point. Well, you did make that point in your brief. You argued that the question is not before the Board as to whether somebody did in fact lie, but whether or not the company reasonably believed that the person lied. Your Honor, I was thinking of the Chairman's thought processes and not what he said. What he said was not relevant to the case. It's also about how we told him how he got to that. So we don't have a large pool of individuals who this, is it Ticetta or Tichetta? It's Tichetta. Tichetta. Tichetta is the person who would have been making the call on whether Cunningham gets fired, right? Yes. It seems like the primary comparator that the ALJ relies on is Arlene Francis, who was someone also under Ticetta who knew that her assistant manager purposely changed time sheets of nine employees, deleting 104 hours of overtime. And when the assistant manager sent Francis an email explaining what she did, Francis said, we discussed the matter. She falsely then told the district manager she had no knowledge of that fact. And then when she forwarded the email chain to her district manager, she deleted the portion of the email chain that would have shown that she knew. So that's, I would say, I could defer to a board finding that that is evidence of dishonesty in an investigation. And yet that individual was not fired. And so I think it's important to the ALJ to say, well, there's a differential treatment here. Yeah, Arlene Francis was a manager, right? She was, Your Honor. Your Honor, there may be a differential treatment in the sense of if you line up the two cases side by side and put them before the court before me right now and say, can you look at this one and can you look at that one, how do you explain them? I do understand that one could make the case that Ms. Francis and Ms. Cunningham are similar. They both may have misled someone intentionally during an investigation. That's a long way from saying that one comparison in the sea of all the other evidence that goes exactly in the opposite direction in terms of what the motivation of the company for firing Ms. Cunningham is, is enough to say, well, that's substantial evidence on the record of a whole supporting a finding of animus. But that's not the way the ALJ saw the evidence. The ALJ didn't say, well, there's a sea of all the other evidence cutting the other way. I mean, Graves, for example, is a manager, and he denied that there was an actual hit list per se, but what he was saying, according to the ALJ and the findings and his testimony as well, is that there was an effort or an attention to trying to catch Ms. Cunningham in potentially a fireable offense. Your Honor, I'm not sure he said exactly that. But he said he suggested that in the context of a racist rant against his boss, Mr. Groves. It was a racist rant against all the HR people, having to be African American. His bias, gender bias or racial bias against that manager is not an issue in the case. Is it? I mean, nobody condones that, but it's not, that doesn't cut one way or the other, does it? It doesn't. It certainly does, Your Honor. How so? Because his motivation for saying anything to the woman in question, Ms. Cunningham, that puts the, that disparages his boss and the HR people because of their race, and says to Ms. Cunningham, oh, and they're out to get you. I'm sorry, Your Honor, you cannot credit that statement with respect. It has to be seen in that context. That's not my question. My question is, I mean, in our position as a review in court, it's whether the ALJ could appropriately question. And I think where one employee says to the other employee, you know, well, he's a go-along-to-get-along guy and says that in racist terms, but also as someone who is a manager and knows what the managerial people are thinking, I'm not sure that those two things bear on one another in terms of whether they're true or not. Your Honor, respectfully, I disagree. In that context, in that statement, when you read it in the entirety, you cannot credit anything from it. And it's my understanding he denied that there was a hit list. The other comparators, there are individuals who did things arguably worse than misstatements within the context of investigations, but that also were not fired. There were individuals who were in gift card abuse situations and lied during investigation, not fired. The ALJ also relies on those. Your Honor, the people who were in the gift card situation who were not fired were subordinates and managers were fired who engineered the gift card. The company had the right to make a judgment that those people should not be fired, even if it wasn't waiving a clearly expressed rule. Your Honor, when you— I just had a question about the clearly expressed rule. The rule that I cited in the briefs was a rule that employees should be forthright at all times. Can you point us to the policy that most clearly shows that Verizon has a zero-tolerance policy toward any misstatement within the context of an investigation that would lead to a firing? Your Honor, I do not believe the Code of Conduct, which provides the relevant rules, says zero-tolerance. Pardon? It says that violating the Code of Conduct leads to discipline up to and including discharge, and it says you must comply with it. So show me—point me to where in the record the policy is that if you don't tell the truth, you'll be fired. Your Honor, at JA 1538, there is a significant— Are you reading it, Counsel? You can proceed. I'm sorry? Would you read it? I don't have it with me. Oh, it says, Your Honor, that you must cooperate completely in any investigation relating to Verizon. You must be honest and forthcoming at all times during an investigation. You must provide any investigator with full, accurate, timely, and truthful information. Misrepresenting facts or failing to disclose facts during an investigation is strictly prohibited. You may never interfere with or obstruct an investigation conducted by the company by any third party on the company's behalf or government agency. Thank you. And what's the lying finding here on Ms. Cunningham? I mean, she said, oh, I didn't tell her to go home. I didn't tell her that HR told her to go home. And then it turns out she had texted her that she was talking to HR. But nobody actually disavowed the basics of the conversation between the two women. Cunningham said, I was working with her. I was helping her. I was trying to troubleshoot. And Victoria Shatori said she was helping me out. I was trying to figure out if I could go home. I mean, there wasn't like a denial of the basics of what was going on. It was sequence and timing. But it seems like you see that as a more – Your Honor, context first, please. Yeah, exactly. That's what I'm looking for. Ms. S. Shatori was working. She called up Mr. Broom, her boss's boss, and says, I want to go home. And she relates it to a problem with her boss, Mr. Graves. It was the first conversation where they had a very brief discussion. It was the second conversation in the last five or six minutes. And it's broken off by Ms. S. Shatori. Mr. Broom says, I'll call you. He does. No answer. She has gone home without permission. He tries to reach her again. Leaves her a message. No response. An entire 24 hours or more goes by before he finally calls her again, and this time she picks up and has a discussion with him. Now, at that point in time, Ms. S. Shatori inexplicably has left, not just left without permission, but left with her boss's boss, waiting for her phone call, waiting for her response, and disobeying his wait for my call. When Mr. Broom talks to Ms. S. Shatori finally, he understands, and I think it's a fair understanding, that Ms. S. Shatori said, well, I talked to Ms. Cunningham, and Ms. Cunningham said she was talking to human resources, and she said I could go home. From the company's perspective, there was a perfectly credible person, whom they knew, Ms. Cunningham, who was somehow, somehow she was described as having given permission to this person to leave, which seemed odd, and it certainly seemed even odder that she'd gotten permission from human resources because Mr. Brooms was talking to human resources, and they didn't know anything about this. Among other things that Ms. S. Shatori said was the conversation was largely by text message. It was what? Largely by text message. When the company interviewed Ms. Cunningham, she said, no, I didn't say anything about human resources giving permission to go home, no, I didn't say she could leave, and it was largely by telephone. The company asked Ms. S. Shatori for her text messages, and she declined to produce them. At that point, the company concluded, based on what Ms. Cunningham had said, that Ms. S. Shatori was lying during the investigation, and they were prepared to fire her. Now, it turned out that, in fact, at the Alan Ritchie meeting several weeks later, Ms. Cunningham says for the first time she noticed two weeks prior to that, not having told anybody in the company about it, she noticed a set of text messages, and, in fact, it turned out that, yes, she had said she was in touch with human resources. Yes, there is a thing saying, you can't go home. And, obviously, there's a substantive conversation in the text messages. Ms. Cunningham's response to that was, well, it looks that way, but it's all in the context of telephone calls that occur at the same time, which led the company to say, show us your telephone, let's see when the phone calls are, and she refused. With respect to that, Verizon was perfectly within its rights to say, you lied. You're continuing to lie. You can't really sell us with the contextual phone calls if they don't appear in your phone bill. There's one two-minute phone call before all the text occurred. And the thing that you told us, well, I just said to her that if it were me, I'd go home. I never said you could go home. That allegedly occurred in the initial phone call after which she texted the union leader saying, I have this historic person, I don't know what to do, and the union leader says, well, you should tell her if she feels at risk to go home. That conversation didn't, and she then said, well, that's what I told her. That conversation could not have occurred because the order is there were no phone calls after that text. Verizon had a perfectly legitimate reason to believe that Ms. Cunningham knowingly lied. They had a perfectly legitimate reason to know she was continuing to lie, even as the investigation continued. They certainly knew that she was withholding information that might allow them to decide whether there was any credence to be given to her story. And they concluded for that reason that she should be terminated, as they had terminated several other people who had lied during the investigation. Now, your honest point that, well, there may be some cases you can find where the company didn't fire somebody, and maybe they're even in the eyes of the ALJ worse, well, I'm sorry, it's in the context of a judge who rejected undisputed evidence about who did what based on a privileged document. And nobody seems to defend the idea of his misreading, frankly, that document after the fact. But that, from the ALJ's perspective, that's the pivot for the case. What is the aspect of Exhibit 49 that he thought was so troubling as to indicate animus? If you pick out the word stage, Your Honor, which he did. Which one? Well, you could say, well. I didn't hear what you said. Oh, stage. The word stage. Stage, S-T-A-G-E? Yes. The email was written between counsel and client concerning what to do to make sure that the matter was held. I mean, everybody knew it was a union official who was being fired. If that was to be the case, if Ms. Takeda ultimately decided to fire her, the process that should be gone through because there was some likelihood that it would be before the NLIV in this court describing what was happening. So make sure you do it right. At some point, the word stage appears to make sure you go through the process. That's what he said proves that everybody was lying. I don't remotely understand that. Well, Your Honor, that's a concern I share. As I said, the privileged exhibit doesn't bear the weight that the ALJ assigned to it. But he said it proved that it wasn't Ms. Takeda who made the decision. Other people made the decision. Everybody who said otherwise is not telling the truth. Implicitly, he rejected the unconstitutional testimony of several witnesses. I understand your argument on evidence. What about what legal arguments do you make? One, as I recall, was the question of stray statements of could be used for animus like Graves' statement. Do we have some case on that? We do, Your Honor, but I think the argument principally is that Graves has no credibility at all in the context of the case. Your Honor, I don't have a case on that holding that one stray statement by a supervisor can't make out animus if the individual isn't connected. That's correct, Your Honor. Which case is that? I don't have a case in my head. Am I supposed to remember all the cases? Well, maybe, Your Honor, you remember the AllData case. You wrote that one. Which one? AllData. And AllData talks about whether there's proof that the animus alleged connects up to the discharge. Right, exactly. And whether there is evidence, substantial evidence, on the record as a whole that justifies the decision. In this case, no, there's no connection. And no, there's not substantial evidence that rebutts all the other stuff that suggests this was exactly what the company said it was. You know, if all that deliberation turns out to be evidence of animus, corporate labor lawyers are going to go out of business. I would have a lot more business than one or the other, Your Honor. Can I just ask, Exhibit 49 is the one that the board said they weren't going to rely on, right? It said they were not going to rely on it. It is also the exhibit on which the ALJ based much of its credibility determination, and the board also said it accepts all the credibility determination. Tell me what you're relying on for that. Just zero in on where you want us to focus in assessing whether the ALJ placed much of its credibility reliance on Exhibit 49. It's not coming to my mind right now. During the course of his describing why he was taking it, I can pull it to you. It's toward the end of the transfer. The judge explicitly said the reason he's taking Exhibit 49 is it disproves the company's description through its witnesses of what happened. And that's in the transcript of the hearing? Yes, sir. His application of the four factors about inadvertent disclosure. It said the overarching principle of justice suggests he should take it because it disproves what the company says. It seems like what Eshatori and Cunningham said, neither of them was completely accurate at the end of the day. Why not fire both? Because nobody believed at the end of the day, nobody believed that Ms. Eshatori was lying. Some of what she said wasn't accurate, even when it was all cashed out. I'm not sure what you're referring to. What the board has argued is that there was no connect, that she was never told that HR gave her permission to leave. Because those statements are sort of not in exactly the same place. But I would suggest if you read those text messages together, a reasonable person would connect up Ms. Cunningham saying she was talking to HR to speed the matter along. And then, well, 20 minutes later, it's okay, you can leave. Well, I guess Eshatori says, according to the ALJ, Eshatori says to Brooms, Cunningham told her she had spoken with Verizon's HR and that they had approved her leaving early. But the text message that's clearly the relevant document there is Cunningham says, don't worry about, is it Ryan? But then she also says, I'm talking to HR. So she doesn't actually say that HR ever approved her leaving. Which, you know, if you're Eshatori, maybe you should be punctilious about that. With respect, Judge Blankenship, you read those backwards. She first says that I'm talking to HR, that will speed the process. And then about 20 minutes later, she says, don't worry about Ryan, you can leave. I'm sorry, if someone inferred from that, if someone drew the inference from that sequence that HR gave her permission to leave, I certainly wouldn't call that a lie. Although Cunningham never told Eshatori that HR gave her permission to leave. No, she said that she was talking to HR. And then she said, don't worry about Ryan. Don't worry about Ryan. Indirectly, she's telling her. It may be reasonable. But what she narrates that Cunningham told her that HR had approved it is not borne out by the text. That's all I'm saying. You know, it's up to Verizon whether they fire someone for that. But it's not accurate is all I'm saying, as the ALJ found. And neither was 100% what Cunningham said. I guess the thing that's stepping back a couple of steps, it seems like neither Cunningham nor Eshatori denied the basic back and forth. Neither of them denied they were in touch. Cunningham never denied that she was trying to give advice to Eshatori. She doesn't have anything on the line. She doesn't have any reason why she would lie. She just didn't think that the texts were as informative as they turned out to be. That's not how you understand Cunningham's line. It's not how I understand Cunningham. It's not how the company understood the plausibility of Ms. Cunningham saying she never went back and looked at the text. So what is Cunningham? Why is it in her interest in your view? And I recognize that we're all bound by what the ALJ does and we all have to give it deference. But in your view, what's the sort of real weight behind the claim? What motivated her not to tell the truth? Yeah. We've wondered about that. Pardon? It's a fair question what motivated her. My conclusion is that she was just trying to show off to some degree that she could help Ms. Eshatori in the way she did. But whatever her motivation was, there's no question that the company legitimately concluded that she lied and continued the lie. That isn't the standard. The standard is whether the company reasonably believed she lied, not legitimately considered that. We do not view whether or not we think she lied. The question is whether the company reasonably thought she lied. Yes, Your Honor. It is, and it's in the context of having – there's another case. Just for a moment. And that's the – Sutton. No, it's actually a case that Judge Palladaro, Osborne has seen, in which the court rejected the company's right-line defense. And, Your Honor, I'd recommend looking at first the first paragraph of that case, in which Judge Palladaro described in detail all the animus that was floating around during the course of the case. And then she identified three things that gave rise to a finding that the right-line – the animus had improved. One was knowledge of the protected activity. Clearly, case here. No dispute. The other was hostility. And there's zero evidence of hostility in this case. Zero. And then timing. And the timing of this case suggests that the company was not the least bit upset with the fact that Ms. Cunningham engaged in anti-union activity because it knew about that. It knew about that for several weeks and did nothing against Ms. Cunningham. It was prepared to fight a mis-executory. Did the ALJ ever say that the company was wrong in concluding she lied or was unreasonable? As I read the ALJ opinion, it's she lied, but that was a pretext for why she was fired, but not that she didn't lie at all. He doesn't exactly say that, but he assumes that. Forgive me for interrupting. It was the chairman in his footnote that said that. That's fine, but that's just one vote. What I'm asking is did either the board or the ALJ say that she had – in reaching a conclusion that there was a firing for protected activities – ever say or suggest that there was anything unreasonable about the finding that she lied? No, neither the ALJ nor the majority of the board made a finding in that respect. Or suggested that had anything to do with their ultimate conclusion in the case. The conclusion of the case was that this was pretext. You can have that even if the person does something bad. But I want to be clear about this. Judge Pillard asked you, wasn't the evidence close about whether she was really lying or not? That was not the grounds at all of either the ALJ or the board's opinion. It was not, Your Honor. Okay. It was not. All right. What you don't – because you asked about the board's findings. I don't know what the board's findings exactly were. Well, I'm looking – all I'm asking you are, are there words on the page that I've missed and the answer is no. No, there are not, Your Honor. All right. Are there further questions? All right. We'll hear from them all in a minute. Good afternoon, Your Honors. Barbara Sheehy for the National Labor Relations Board. I'm going to hit on, I think, three different areas where there sort of seem to be a lot of questions. And I will start first with sort of, I guess, where the court left off. I'll meet with the court where it was at the end of that conversation about whether it was pretext, whether she lied. And, Judge Garland, you're absolutely right. There is not – the ultimate violation, the finding by the board, doesn't rely on an express finding that Bianca Cunningham lied. I think, just as a footnote to that, I think as a reasonable reading of the decision, the board does not expressly find that she did or did not lie. But if you read it, more often than not, words like allegedly lied are used and that she misremembered. Hold on. This is quite important. Sure. There might be an argument in favor of finding anonymous and a violation of the right line that the employer said she was lying when she wasn't or unreasonably thought she was lying when she wasn't. That is not in any way the basis of the board's opinion. No, you're absolutely right. So that's it with respect to that as a factor. That was not a factor in the board's decision. Right. The board finds that the reason she was fired was because of her protected activity. But it did not use as evidence of that the fact that actually she didn't lie at all or it would have been unreasonable to conclude she lied. No, that's right. Assume she lied and then went on from there. Right. Assume she lied and then there are two findings that the board makes in regard to that. Where even if she lied, we don't believe that that was the reason the employer lawfully fired her. And then the very last point that the administrative law judge makes is that even if she, I think maybe it's the second to last, even if she did lie, it was in the context of a protected conversation and that's not a lawful reason. So there are sort of two different findings by the board there. The primary one, of course, would be even if this is all true and she lied, we don't believe you, Verizon, that that's why. I got it. So now one of the reasons for concluding that she was wrongly terminated was the evidence of the hit list. Right? Right. Absolutely. And there were four, actually. There were four factors that were considered. I'm not sure we've actually. I want to focus on that one for one moment. Sure. Go ahead. The only evidence of the hit list that was referred to by the ALJ was the text message, right? Absolutely. So how can that be when the person who made the statement testified? And I would say one, two, three, at least four times denied that there was actually a hit list or that it had anything to do with being on the union. Why doesn't that have to at least be addressed by the ALJ in reaching its conclusion? I'm not saying that the ALJ couldn't have in the end concluded that there was a hit list or whatever it is, but doesn't the failure to address what the guy said under oath make us doubt whether that's a reasonable basis for reaching a conclusion? Sure. Whether it undermines her substantial evidence? Sure. So let me sort of add two parts to the answer. The first one is before we focus just exclusively on Grace's text. Before we focus just exclusively on that, I don't want to get into anything else. First, I want to know why the failure of the ALJ to address contrary evidence by the speaker, by Graves, shouldn't make us doubt the substantial evidence here. Sure. On that specific issue, there were two different things I think that the ALJ says, not specific to the hit list. There's no denial by Graves that what he meant was the employer was deliberately putting union activists at that store, which was also part of the ALJ's analysis of Graves' text, like what was going to show at Animus. So you have that. There's no denial by Graves of that, and the administrative law judge recognizes that. There's no denial of what? Denial that Graves – so Graves said – there were several parts to Graves' text that were considered. There's the hit list. Yeah. And then there was the other part of the text that referred to the employer deliberately placing union activists at that store. Wait a minute. You're still not talking about his testimony. No, I am. Graves doesn't disavow – so Graves disavows what he meant by hit list. Graves does not disavow that – and he doubles down on it several times – that in fact the employer did put known union activists and union personalities, I think it's referred to several times, at that store. So you have him certainly walking back one part. At the store. At that particular – the Brooklyn location, yes, at that particular – No, that doesn't mean there were negatives to the union activists. I don't understand. Just briefly, I think we have a case – or we cite a case in the brief that says that where an employer has sort of targeted a specific area as a union stronghold, that it's a consideration. And I think that – Can I ask you where is that discussed, the point you're making now, in his finding of animus? The finding of animus begins at JA 39. He mentions the hit list, right? Yeah, sorry, I'm looking. Where is the part about the fact that they concentrated union members in the store? So if you go – I'm sorry, I don't have my – I'll just say the paragraph. I don't have it in the joint appendix. But on the page you just referenced, I believe, or maybe it's the next – it's the second page of the animus discussion. The paragraph starts here, I thought. Yes, that's the one I want, the one that says here, I thought. Yep, here, right. Go about three-quarters of the way down. Similarly, Graves's text message that Cunningham's store is looked at as a stronghold, a base per se, also evidences anti-union animus. And that was never disavowed by Graves during his testimony. Say that again. You read it too fast for me. I'm sorry. I just feel like I'm really loud on this microphone. Similarly, Graves's text message that Cunningham's store is looked at as a stronghold, a base per se, also evidences anti-union animus. All right, let's go with the first one. Why don't we have to reject the first, the argument about the hit list, in light of his contrary testimony? I believe – let me make sure before I say this. I don't know. I thought that – I'm not going to say that because I'm not positive it's actually in the ALJ. So he says all this stuff about the hit list. Then when the guy is asked under oath, on direct, presumably favorably, and will use someone – you were referring to a hit list and union supporters weren't you? No, you weren't. No, I was not. Then you were referring to a hit list of answer in general. In general? Question. In general. What is the general hit list? And the next page. What did you mean when you texted? Me, as an employee, I felt in general there was a hit list. By the way, was he – he was a supervisor, right? He was. He's not a member of the union. He's not a member of the union, no. Me, as an employee, I felt in general there was a hit list. I myself felt that I would be in danger. I myself had people that I thought might be in danger. A hit list. It wasn't union or not union. And it goes on several times. Now how can an ALJ who says there's a hit list not at least address this testimony? Sure, and it may be that that was an oversight on the part of the administrative logic. But what I would – No, no, what is the answer to it then? If it's an oversight, the rule about substantial evidence requires consideration of both plus and minus. It seems like the evidence here on that point upon which the ALJ is relying is quite minus. And you have further doubt. So that's all I can say about the Graves text. You're absolutely right. He doesn't address the disavowal at the hearing. He does speak about other parts of Graves's. But then I think what's most important is that – I think perhaps we're forgetting that he identifies the most compelling evidence of animus. So it's not – I would say I would readily acknowledge we would be as much – What's the most compelling evidence? I would readily acknowledge that if there was only Graves's texts and you didn't have an administrative logic addressing various parts of those texts, it would be a harder argument for me to make. But there are more. The Graves was the last. And the more? The more are only two more things. The length of the investigation and the comparators. Two different kinds of comparators, sorry. In my notes, I haven't missed two different. There's the disparate disciplinary treatment, people who – and then there's the more egregious violations getting the lesser punishment. So to answer Judge Silberman's question, identified by the administrative law judge the most compelling evidence, and that's a direct quote from the decision, is the disparate disciplinary treatment. And we've already talked a little bit about the Arlene Francis example, but there were others. It's not just there was this one. Arlene Francis was a manager, right, and not an employee. Absolutely. They're all bound by the same code of conduct, though. That's true. That's true. If you were running a company, do you think you'd give a senior manager a little more leeway than you'd give an employee? I don't run a company, but I tell you what, if my manager came to me and said, yeah, I authorize, or no, I don't know anything about these non-employees not getting any overtime to the tune of $300, I might have an issue with that, yes. But I don't run a company. Of course, of course, if you were a manager. Now, but it's not up to the NLRB to determine proper management practices. Absolutely not. Therefore, the cases which the ALJ described that he thought were more serious than lying in investigation are all utterly irrelevant, are they not? No, I don't think so, and I'm not sure most of them. Isn't it improper for the ALJ or the board to look at other matters and say, gee, I think these other matters are more serious? I think if I was running the company, I would regard those other matters. Now, every court that's looked at that kind of analysis said the board can't do that. Sure, and I don't know. So then we can flip to what Verizon says. Here are the right comparators. These are people we did fire, and that came in on the second part of the right-line test. And if you look at those, those aren't even comparators either. Let's remember, Bianca Cunningham has no underlying misconduct. She did nothing other than engage, she was required to do, in an investigation. All of the other examples in the record, everything, everything both from the general counsel's side of the house and the employer's, is all of the people who lied in investigative interviews had underlying misconduct. And even sometimes those people, so you had underlying misconduct. Well, why don't you think that Cunningham had underlying misconduct? Because by lying, she was jeopardizing the other employee very seriously. But the employer doesn't say that. The employer doesn't, there's no identification of misconduct. You have to go with what the employer says. And they said we fired you because you said, they identified three things that they really cared about. You don't think it's fair to say that they had a policy generally against lying during an investigative interview? I actually don't think the board, or I have a problem with that. What we have a problem with is that if you have, it was the next step of that where they say, we have this policy, and if you violate it, you get fired, flat out. And that is where the board takes issue with them, saying, you didn't prove that, which you have to do. You don't, you can't just show us. Who has to prove that? Once the general counsel's satisfied his prima facie case, they have to show, I would have. Isn't the general counsel using the same evidence as the prima facie case? No, the general counsel, I don't. The general counsel used disparate treatment as far as his prima facie case, isn't it? Right, but not to different ones. It was different. I know there were so many examples of sort of misconduct going on. There was a set that was looked at to show people do worse things. The Arlene Francis's, the five employees who lied about more than that, who lied about gift card use, the guy who took the tablet and then lied about it and only said when presented with an email, oh yeah, it turns out I did take that tablet. Those were the general counsel's exhibits for showing you tolerate a heck of a lot more than this one woman who couldn't remember telephone conversations and whether she had more text messages or phone calls. And then when... A little more than that, wasn't it? What's that? A little more than that. Sure. And then we had the, so that was the prima facie case. And then there was the shifting to the employer to say, we would have fired her anyway. And in an effort to do that, they say, we have a policy. If you lie in an investigation, you get fired. And those examples, and we have them in a chart on page 38 in our brief, those examples, they argued, showed we don't tolerate lying. And then what the ALJ does and what the board does is says no, that comparator evidence doesn't do anything for you because those aren't good examples of comparisons. Those people have underlying misconduct and then they lied about it in an investigation. So those aren't good comparisons. They don't even stop there. Then the board says, even if we take for your word that these are comparators and that our charging party is on the same footing as them, all you've done is show that you could have fired her because you have the general counsel's evidence showing one thing. You have the employer's evidence showing another. And so the best the ALJ says is this is a mixed record. I prefer sort of an inconsistent record to show that this is in fact not the policy of this employer. And so then they go back to you didn't show, you didn't rebut the prima facie case because you didn't show you would have fired her. You showed that you could have fired her, and that's insufficient. So certainly there were two sort of different sets of evidence that were being used for different things, and then they came in on the pretext fine and things like that. So it's a bit confusing, but it certainly wasn't a matter of the general counsel didn't put anything on and the employer did. What is it that gets us to this second stage? Activity, knowledge, and animus. Where's the animus again? If this isn't evidence of animus but rather of not showing you could, where's the animus evidence again? So the animus is the, I'm going to call them the Arlene Francis examples. So the ones on 38 are strictly. Of which there's only four, right? At least four. I think we put four in the brief. No, they're page 34 of our brief. So there's one, two. Are there only two? No, one, two. No, there are more than that from the ALJ in the brief. Let me see where the ALJ does it. No, there are more than four. Five. So the Arlene Francis one is the one that obviously gets the most amount of words. And then the other, and then if you go down to the bottom, on mine, I'm sorry, it's ALJ 23. Hopefully it has that number still in your joint appendix. The last pair. In the Arlene Francis case, wasn't the manager who made the decision believe she was telling the truth? That's what Verizon said, yes. Isn't that true? I don't know if that's true. That's what a Verizon witness said. Well, you have no contrary testimony. Well, the ALJ says, the ALJ doesn't credit that. The ALJ says unbelievably when asked to explain the difference. He has no evidence of any other kind. Certainly not. The only evidence is that the manager, the manager's manager believed her. Right. That's the only evidence. Okay, so if you don't believe, if the ALJ doesn't credit that testimony, what does he have? Nothing. Well, he has the performance file that came in that shows she received the email. Ten days later, she says, I've never heard of this thing before. I don't know anything about this. Then they produce the document showing, well, it turns out, actually, you did know about it because you replied to your subordinate. And then she says, oh, yeah, it turns out I do remember this. And in the meantime, she goes around the plant and tells everybody that it was her subordinate's fault, not hers. So I think that the, so there's that. And then you do have the ALJ saying he doesn't believe what this witness is saying, the self-serving testimony to say, well, we believed her. So she's very clear. I believe her.  The Verizon witness says that. Oh, you believe her. Judge Silverman believes her. No, no, no, no, no. The witness said, I believe her. The witness did, yes. And you have the ALJ basically saying, I don't credit that testimony. I don't find that persuasive, given all of the factors. Or all of the, not factors, the considerations surrounding that testimony. I mean, he characterizes it as unbelievable. In any event, that leaves nothing. Well, there's, well, there, like, again, there are other. No, I mean, once he says, I don't believe her, then what, you have facts, but you don't know any way to evaluate them. That's fair. Right, right. But then you do. There's no witness to the contrary. There is no witness to the contrary. No, they didn't. No, no. But you do have the other examples where there's no question that the five employees in the gift card scam lied. And, yes, during the scam itself, they were acting in the direction of supervisors. I don't know exactly how that happened, but. And the supervisor was fired. I don't, I take their word for that. I didn't know that, but I would not dispute that. But the, but they lied in the interview. So if the, so certainly you could forgive, I suppose, if you're the employer, that they were acting at the direction of their supervisors. But if you're going to take the position that we fire you no matter what, if you lie during an investigation, there were examples of these gift card scammers that actually didn't. They lied during the investigation. And, again, there's the demo, so these are all the examples. This is the general counsel's examples. There's also the store tablet. The man took the tablet to take it on vacation when he was asked about it, and they gave him the make and model number on the thing. And he said, I've never heard of that. And then they show an email that he had recounted to a friend of his that he had lost it. And then in that interview, immediately he says, oh, yeah, it turns out I did take that. And then when I sold my car, I forgot to get it out. But that was never recovered, as far as I know, for Verizon. So that was the, so those are sort of the factors of the animus finding, of the disparate disciplinary treatment, the more egregious violations. What about the length of time? Isn't that a little ridiculous? I think the length of the investigation is ridiculous, yes. Look, it's obvious the woman was involved in protected activity. Is it somehow evidence of bad faith for a company's lawyers to consider it carefully before the decision is made? Certainly I'm not going to stay, I'm not going to stand here and say it's unreasonable for lawyers to. Well, she may be out as a private lawyer, and you only hurt your rightful. But I would say, as we cited in the brief, there's the Inova case, where it can be a consideration for the court to look at, was this an unusual investigation? Is it unusual for a person who left two hours early to ultimately have the violation, or ultimately have the investigation run three months? It was three months from May 21 until September, maybe even longer. I may be doing the math wrong. Three months, and it was the highest level, it was very high-level officials. Some of this time is dealing with the union, based on. Certainly there are the Alan Ritchie meetings and things like that. But when they announced the Alan Ritchie meetings, I believe the record shows that this happened within two weeks, because there were two of them scheduled, and then one didn't end up in a termination. So unless there are any other questions on animus, I can talk about. How long was it before she found the text messages in? I believe she found them on right around July 22. How long into that was that? That was May 21 to July 22, so was that three months? Two months, sorry, two months. So it wasn't until two months into it that, I'm going to use the word changed her story. Again, not on the question of whether she actually did or not, but since the board seems to assume it. So it took two months before she changed her story? Yes. Then does it seem unreasonable that it would take another month then after that? Now we're only talking about one month decision. No, no, no, because she wasn't terminated until September 14. So they find out, so to be fair to the employer on the timeline, she finds out on July 22. She realizes that on July 22, but to be fair to the employer, the employer isn't told of her new text, so the text that she just located until August 6. And then she's fired when? Fired September 14. Okay, so that's one month from when she tells a story that would lead to her being fired. Right, but let's remember it's not a completely independent investigation. All of what she had said had already happened. The interviews, there were several interviews. They weren't started from scratch, I guess is my— You just said that the employer didn't have the text until August? True, and all I mean is that you're not starting the investigation anew because you're working off interviews ahead of time. All of a sudden on August 6, the employer now has textual evidence that the story—we're assuming for this purpose— I know, I know, I understand. That she lied. They didn't have that evidence before. So that's when the real investigation of her firing begins as compared to the investigation of whether—how do you pronounce the other one? Estuary, I have no idea if that's right. Yeah, or estuary should be fired. So now we're only talking about a month. Right, but I think the board is looking at sort of the overall— I know they are, but why are they looking at it? She hasn't given cause for her own firing until we find out that her story is different than what she told them before. Right, and I guess what the board—I don't know how to say this very clearly, but you know other than the text messages, there isn't any— the board didn't—I'm sorry, the employer didn't have to start the investigation anew. I don't understand what that means. She hadn't done anything wrong as far as the board— But they still had all of her interview knowing at that point. So you have two different stories. They knew that— Different story, right? It's only a different story to the—what she said is still the same. Now you just have text messages that differ from her account. But she never changed her oral rendition of what happened. So the employer is starting from a point of— I'm confused. I think the way that ALJ puts it is that there was a prolonged investigation, and he compares when employees leave a non-unionized store— Right, it's a four, five days. It's the unionized store which encompasses Eshetory and Cunningham, that there's a kind of attention to all of these people are implicated in the union, right? Right. Because Eshetory is a member, Cunningham is a leader. So the way that ALJ puts it, at least, is that employees assigned to stores other than the unionized Brooklyn locations simply receive written warnings, and then it was a federal case where it was a unionized store. So I guess the way the ALJ seems to be seeing it is Eshetory, Cunningham, whatever, they're going to— It's a very long— They're going to push on those stores and the employees involved more intensely. Push on those stores or treat them very carefully. The ALJ classifies it as sort of extra scrutiny having to do with— That's not being very careful. With the union. Certainly that's another way to look at it, but the administrative law just specifically finds that it was a union aspect of it, not— Well, of course. No, but they can't have found that. This itself is the evidence of the union. You can't start with the assumption that it's the union and then say this is the cause of the union. Right, no, but the store—the differentiation of the ALJ is that it's a store that's unionized versus a store that's not, and employees at stores that are not unionized leave three hours early without approval, get a written warning. Quick decision. Leave work without authorization. Decision made within a few weeks. Receive a written warning for leaving early multiple times. Forty-two times late and early—leaving early three times. Called out sick four times. Not fired. So it's the union stores versus the non-union stores. She wasn't fired for leaving early, was she? No, they say that they fired her because she lied during the investigation. Right. Where can you tell me which paragraph? Again, I'm just sorry. It's hard to find. Which paragraph is the paragraph about how long it took? It's one of the factors under animus. Let me find it for you. It's going to say the length. It's going to use the phrase length and breadth of the investigation. That's the one? Length and breadth. That's the one it starts with, finally. But where is it? I'm on page 24 of the actual ALJ. Let me look at mine. It's accompanying about 189. I never use the appendix for my decision. The defining of animus begins on page J38. I'm just trying to find it. I saw it, too, but where is it? Sure, so go to page 41, joint appendix, right around line 20, finally the length and breadth of the investigation. Yeah. And then the next paragraph gives examples of how non-union shops, employees leaving early, have been treated. And where did they? So this might be an argument for they took too long with eschewary? Is that the argument? Well, I think it's generally the events into May 21, so that's going to involve the conversations. It's going to involve the whole thing, that eschewary's departure started but sort of pulled in Cunningham as the investigation unfolded. Well, could they have made a decision within five days, given the union contract and the requirement to retire? I don't know. I don't know. Having to hold an Alan Ritchie meeting, we probably couldn't do it in five days, no. They had that case, the Ritchie case, which led them to understand, as I gather, that they had to really negotiate this with the union. I don't know if they did. They still did. But notify, discuss with the union. Right. Which is part of what they did. At the end, yes, at the end. All right. Are there further questions? I guess not. All right. Any time left or no time left? I'll give you a minute. The case you're referring to was the MECO case, whether a manager's comments could be attributed to the decision. I didn't hear what you said. The MECO case. Yes. That's the one I did not know the answer to your question to before. A straight comment of a minor supervisor not having anything to do with the decision to take action is not regarded as significant anonymous. Yes, Your Honor. Counsel just made reference, as the court occasionally does, to the prima facie case presented by the general counsel. I think we should be clear about what that means. In a right-line case, the general counsel has the obligation to prove. It's the burden of proof to prove that there is that anti-union animus was a motivating factor to the discharge. It's not some showing. It has to be proof on the record as a whole. Then the employer can have a response. You will not find a case in which just disparate treatment, without any other showing of anti-union animus, or disparate treatment that's several cases of, you know, it's like a tie score, you know, how many times it got fired, how many times it didn't get fired. You'll find when you go through the cases of this court, you'll find that the board has met its burden, that you have clear evidence of anti-union animus. Two or three cases in the most recent years have the employer representing the employer saying, we're going to get you to the person ultimately fired. Not only was the evidence not here, but the point about evidence on the record as a whole is, the ALJ never even mentions that Brett Ulrich, the company's chief negotiator, got on the stand under oath and testified that he enjoyed working with Ms. Cunningham, that they had productive relationships, and that Ms. Cunningham herself could testify to no animus. In fact, the only fact related to this that the ALJ found was the company had noticed because Ms. Cunningham's manager complimented her on how well she handled both her union activities and her responsibilities at the store. And the ALJ used that against... Yeah, the ALJ started off with the assumption that if you fired a union representative, then the question is, let's find the anti-union animus. And that's what he set out to do. That's why explicitly he took Exhibit 49. And at the very least, there ought to be an explanation in the Board's decision for how, given the enormous weight that there was no anti-union animus, it came to the conclusion it was anti-union animus. This Court's entitled to more than a couple of footnotes. I don't think that those statements that I enjoy, working with a person who's very professional, necessarily contradict any finding of anti-union animus. You can think that the person is in a role that you abhor, you'd rather not have to do that work at all, and think that the person who is nonetheless engaging with you in that work is doing it in a professional and, you know, fair manner. So I think that that's... I mean, it's sort of like the misunderstandings people have about sex discrimination. Someone can be very nice to you and nonetheless behave in a discriminatory manner. So I don't see that as a flaw, as a fatal flaw in the ALJ's opinion. That's all I'm saying. No, no. It's a fatal flaw not to address the evidence that would establish there was no anti-union animus. Not if you don't think that it's either here or there with respect to animus. Well, there was testimony by every single company witness that the fact that Ms. Cunningham gave aid to Ms. Escharatory that night had no effect on their decision to fire her. That certainly has to be addressed. They were all, according to ALJ, implicitly perjuring themselves. And in the context of what the record is the whole, the fact that, in fact, Mr. Ulrich also testified that Ms. Cunningham had repeatedly, during the course of negotiations, brought complaints from other employees to the table to be addressed. And he found that to be useful. That is inconsistent with the idea that he participated in a discharge months later because Ms. Cunningham gave aid to Ms. Escharatory that night. I think it's the baseline. The burden of proof is on the general counsel because we assume, and people testify in every discrimination case, whether the plaintiff wins or not, that they didn't mean any harm. I don't see that as a flaw. The burden is put on the general counsel precisely because the employer is presumed to be acting without animus until proved otherwise. It's the baseline that's also inconsistent with the finding. Your own words in the Osborne case. Where's the evidence of animus directed to the employee? Where's the timing? The company knew what Ms. Cunningham had done in terms of aiding Ms. Escharatory for several weeks. It turned to discipline Ms. Cunningham or investigate Ms. Cunningham first only after it had reason to believe she lied. The only thing of the three things you identify was the company's knowledge of Ms. Cunningham's protected activity, and every witness who testified said, that was pretty good. Thank you very much. I have one more question. Did the company say that the reason it fired her was because it always fires people who lie in an investigation? No. I said that the company consistently fires people who they believe are lying during an investigation. Was this testimony? No. A couple of witnesses asked whether they were aware of employees who had lied and not been fired, and they said no. That's a different proposition. So the NLRB's proposition is the company says it always fires, and then it comes up with some examples of ones that it didn't, and that means the company is lying. The statement is not based on the record, Your Honor. I said that the company, when it identified lying, consistently fires people, and I think that's true. There were exceptions, and I said there were exceptions at the time. The one with the gift cards was the most obvious example. So the answer to the question is the company never testified that they always fire anybody who lies. I recall no such testimony. Yes. I recall a testimony saying the company fires people who lie. You talked about they have a policy. I understand that it fires people who lie, but that's different than saying it always fires. It fires everyone who lies. That statement was not made.  We'll take the matter under submission. Thank you, Your Honor.
judges: Garland, Pillard, Silberman